IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TIMOTHY CHAMBERS,**                    Case No. 1:16 CV 2285

      Plaintiff,

      v.                                   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                            MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Timothy Chambers ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for SSI in August 2013, alleging a disability onset date of August 2, 2005. (Tr. 159-64, 179-81). His claims were denied initially and upon reconsideration. (Tr. 116-17, 126-27). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 131). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 21, 2015. (Tr. 57-85). On September 24, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 34-44). The Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on September 14, 2016. (Doc. 1).

FACTUAL BACKGROUND[1]

*Personal Background and Testimony*

Plaintiff was born in August 1959 and was 53 years old at the time of his application. (Tr. 43). He testified that he had a GED and some trade school education in carpentry. (Tr. 61). He had previously worked as a cabinetmaker more than fifteen years prior to the hearing. (Tr. 62). He testified he had applied for other jobs ("I can't really say for a fact when . . ." and "[p]ossibly last summer or sometime[].") . (Tr. 62-63).

At the time of the hearing, Plaintiff lived with a friend. (Tr. 62). He helped with housecleaning including vacuuming. (Tr. 63). He would also take the garbage out or clean the sink. (Tr. 70). He would "[s]ometimes . . . help . . . mow a little bit", but was "very short-winded all the time." (Tr. 64). He was able to prepare himself simple meals ("TV dinners . . . and bologna sandwiches"). *Id.* Plaintiff would also perform chores, such as laundry, for friends, in exchange for those friends buying him things. *Id.* Plaintiff also testified he could only perform chores for five minutes at a time before he becomes short of breath. (Tr. 74). He then has to sit down for fifteen to twenty minutes, before he may be able to get up and work for ten more minutes. (Tr. 74-75). For entertainment, Plaintiff played guitar "[e]very now and then", and "fiddle[d]" with a harmonica. (Tr. 71). With the harmonica, he "run[s] out of wind quick." (Tr. 72). In the summer, he liked to fish. *Id.* Plaintiff also testified he likes to read, ride a bicycle, and get together with friends. (Tr. 72-73). He only takes short rides on his bicycle. (Tr. 75-76).

---

1. Plaintiff's challenge is directed at the ALJ's consideration of his physical impairments and "does not dispute the ALJ's evaluation of his mental impairment." (Doc. 16, at 3). As such, the Court will only summarize the facts and evidence related to Plaintiff's physical impairments.

Plaintiff testified he believed he was unable to work because of his "breathing problems, walking problems", and "[a]ll kinds of inside problems." (Tr. 63). At the time of the hearing, Plaintiff had a cane. (Tr. 65). He testified this was due to swelling in his legs and feet. *Id.* He reported using the cane "off and on for years" and that he "crawled in the coal mines when [he] was younger and it kind of messed up [his] knees." *Id.* He used the cane "[a]ll the time" for balance except "[n]ot for short walks". *Id.* Plaintiff testified he gets off balance due to his knees and ankles. *Id.* He was taking water pills, but "really [couldn't] tell" if they were helping. (Tr. 66).

Plaintiff also testified he was going to be tested for seizures. (Tr. 66-67). He testified he would have one or two episodes per month where "it just hits" him, and he could "be laying in bed or [he] could be somewhere and – [he has] been walking down the road and forgot where [he] was going." (Tr. 67-68).

Plaintiff was taking a variety of medications, but could not identify what kind. (Tr. 69). The medication makes him "feel a little better" and "not as restless . . .". *Id.* Plaintiff testified he did not use an inhaler and had not had one "in a long time." (Tr. 78). The albuterol made him "shake" so he "gave up taking them". *Id.* When asked about side effects of his medication, he testified he thought his coughing and swollen legs and feet were side effects. *Id.* The swelling started when he started taking water pills about a month prior to the hearing. *Id.*

Plaintiff estimated he can walk for "10, 15 minutes at least" before he "just go [sic] breathing too hard and [he] has to stop a little bit" and take a break. (Tr. 76). The length of break he needs depends on "the weather", "the humidity and . . . how [he's] breathing." (Tr. 76-77). He also estimated he could lift "at least 10 pounds, 15." (Tr. 79); *see also* Tr. 80 (estimating he could pick up 20 pounds). Plaintiff estimated he could carry 20 pounds a short distance, but was not sure he could lift 20 pounds several times per day. (Tr. 80).

*Relevant Medical Evidence*

Plaintiff has a history of asthma and bronchitis dating back to at least 2005. (Tr. 229).

An April 2010 chest x-ray showed "an ill-defined opacity" in the left lung, "which overlaps the anterior aspect of the left first rib." (Tr. 336) (December 2011 treatment note containing findings from April 2010 x-ray). "These findings [were] concerning for a lung mass or atypical infection." *Id.*

In August 2011, Plaintiff sought to establish care with Todd Wagner, M.D., at Care Alliance. (Tr. 325-27).[2] Plaintiff reported a history of bronchitis, gastritis, and arthritis. (Tr. 325). He also complained of a persistent daytime cough, occasional nighttime cough, and hand tremors. (Tr. 325-26). He reported using albuterol in the past, but did not like it because of "increased agitation". (Tr. 326). On examination, Dr. Wagner found Plaintiff had "good air exchange" bilaterally. *Id.* He was assessed with intention/resting upper extremity tremor, etiology uncertain, chronic airway obstruction ("probably dx give[n] chronic bronchitis, h[istory of] tob[acco] use" with "currently minimal symptoms"), gastritis/duodenitis, and other chronic pain. (Tr. 326-27).

In November 2011, Plaintiff saw Rasai Ernst, M.D., at Care Alliance for follow up. (Tr. 330-32). He reported his hand tremor comes and goes, with no other symptoms, and that it had improved since August. (Tr. 330). He noted his cough was worse in the morning, and clears up throughout the day. *Id.* Plaintiff also reported smoking two to three cigarettes daily. *Id.* Plaintiff reported shortness of breath after climbing one flight of stairs. *Id.* On examination, Dr. Ernst found a symmetric resting tremor in both hands. (Tr. 331). Regarding Plaintiff's lungs, he noted Plaintiff had "[m]ild inspiratory rhonchi, otherwise clear". *Id.* Dr. Ernst assessed chronic bronchitis. (Tr.

_____

2. This treatment note lists two physician names: Todd Wagner, M.D., and Lisa Navracruz, M.D. *See* Tr. 325-26.

332). He noted Plaintiff had made progress in reducing his smoking, and that an albuterol nebulizer in the office "did not seem to change his symptoms, but his symptoms typically are worse in the morning anyway." *Id.* Dr. Ernst gave Plaintiff an albuterol inhaler "and instructed him to use this 2-3 times weekly before going to bed to see if this improves his symptoms." *Id.*

In December 2011, Plaintiff followed up with Dr. Ernst. (Tr. 335-37). He reported he was still smoking two to three cigarettes per day. (Tr. 335). He still had a morning cough, and his walking was "sometimes limited" by shortness of breath. *Id.* Dr. Ernst noted at the previous visit, "we recommended that he increase his albuterol to nightly use", but Plaintiff was not using his inhaler more than once daily because it made him "jittery and agitated". *Id.* On examination, Dr. Ernst noted expiratory rhonchi and wheezing throughout Plaintiff's lungs. *Id.* Also at this appointment, Dr. Ernst reviewed the April 2010 chest x-ray showing a lung mass. (Tr. 336). Dr. Ernst assessed chronic obstructive pulmonary disease ("COPD"), with "[c]hronic bronchitis likely" based on Plaintiff's symptoms. *Id.* He started Plaintiff on a 250/50 Advair inhaler, and continued smoking cessation encouragement. *Id.* Dr. Ernst also noted "[c]oncern for lung mass", referred Plaintiff to radiology, and noted the chest x-ray was "very concerning for malignancy," but that Plaintiff had "no constitutional symptoms at this point." *Id.*

In September 2012, Plaintiff underwent a consultative physical examination with Irina Papirova, M.D. (Tr. 425-41). Plaintiff reported generalized pain for more than ten years. (Tr. 425).[3] He also reported shortness of breath, "constant since 2000." *Id.* He reported a productive cough, which was worse in the morning. *Id.* He also noted "that respiratory therapy, which he is using, is

---

3. Dr. Papirova stated: "Please note, as above, the claimant is reporting that he has been having this pain for more than ten years which is worse right now. He could not specify what makes this pain better or what makes it worse. He is just saying that he is taking over-the-counter stuff to control his pain." (Tr. 425).

helping with his shortness of breath." *Id.* He reported using albuterol, and that it made him "jittery and agitated." (Tr. 425-26). Plaintiff reported having been a heavy smoker, but that he had quit "two to three weeks ago." (Tr. 426). As for his daily activities, Plaintiff reported he was cooking two to three times per week, cleaning (including laundry) once per week, as well as showering and dressing himself. *Id.* He reported watching television and that he "likes to go out to bowl and [to] bars." *Id.* On examination of Plaintiff's lungs, Dr. Papirova noted decreased breath sounds, but normal percussion and diaphragmatic motion. (Tr. 427). Dr. Papirova assessed, *inter alia*, COPD, chronic bronchitis, asthma, and a lung mass. (Tr. 428). Plaintiff's prognosis was "[g]uarded." *Id.* For her "medical source statement", Dr. Papirova stated: "There are mild limitations to pushing, pulling, and lifting. There are moderate limitations to physical exertion due to shortness of breath." *Id.* Plaintiff gave a good effort on the pulmonary function test, and a bronchodilator was not used because Plaintiff's FEV1 "was greater than 70." (Tr. 436). Dr. Papirova interpreted Plaintiff's pulmonary function study as normal. (Tr. 437).

In November 2013, Plaintiff underwent a second consultative physical examination, this time with Hasan Assaf, M.D. (Tr. 454-71). Plaintiff reported "that he started having respiratory difficulties 15 years ago" and that he had shortness of breath both "at rest and also following exercise." (Tr. 454). He also reported a productive cough. *Id.* He reported albuterol did not improve his symptoms and caused him to be "jittery and nervous." *Id.* "The medication was later changed to Advair and Symbicort which he states that he continues to take at the present time. He states that Advair and Symbicort improve his symptoms." *Id.* Plaintiff also reported pain in his feet, calves, and shoulders, as well as chest pain. (Tr. 454-55). Plaintiff reported he stopped smoking in 2011. (Tr. 455). Plaintiff also reported cooking daily, cleaning (including laundry) once per week, shopping once per week, bathing every other day and dressing himself daily. *Id.* He stated he

"watches TV, listens to the radio, reads, [and] socializes with friends." *Id.* Plaintiff "appeared to be in no acute distress" at the examination. (Tr. 456). His gait and stance were normal, he could heel and toe walk "without difficulty", perform a full squat, rise from a chair "without difficulty", and needed no help changing for the examination or getting on and off the exam table. *Id.* On examination, Plaintiff's lungs were clear to auscultation, and percussion and diaphragmatic motion were normal. *Id.* Dr. Assaf assessed COPD, by history, bilateral foot pain, bilateral shoulder pain, bilateral calf muscle pain, and left sided chest pain, probably musculoskeletal in origin. (Tr. 457). For his "medical source statement", Dr. Assaf stated Plaintiff "should avoid exposure to dust and other industrial pollutants. There are mild limitations in activities requiring prolonged standing, walking, or lifting with both arms." *Id.*

On a pulmonary function test performed at the time of the consultative examination, technician Katie Cleveland noted Plaintiff had no breathing difficulty at the time of the examination. (Tr. 465). Plaintiff, however, "gave very poor effort on the test". *Id.* He refused to use albuterol before the test, "stat[ing] it makes him shake, therefore post. test was not complete." *Id.* Ms. Cleveland noted she had to repeat instructions to Plaintiff several times, "because he would show no effort in blasting and very poor effort exhaling for less than [the] 6 seconds required." (Tr. 466). Ms. Cleveland stated Plaintiff "was constantly reminded of his poor effort, and he would state he was 'giving all he's got.'" *Id.* Dr. Assaf opined the study was "not valid because of increased variability in both FEV1 and FVC." (Tr. 467).

Also in November 2013, state agency reviewing physician Leanne M. Bertani, M.D., reviewed Plaintiff's records at the request of the state agency. (Tr. 95-97). Dr. Bertani opined Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) sit, stand and/or walk for a total of six hours in an eight-hour workday; and 4) push

and/or pull in an unlimited capacity; but that he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his respiratory condition. (Tr. 96-97).

In January 2014, state agency reviewing physician Leigh Thomas, M.D., reviewed Plaintiff's records and affirmed Dr. Bertani's assessment. (Tr. 109-10).

In April 2015, Plaintiff underwent a chest x-ray due to shortness of breath. (Tr. 759). It showed "[s]uboptimal inspiration with crowding of bronchovascular lung markings" but "[n]o evidence of acute abnormality." *Id.* A chest CT performed the same day due to chest pain and shortness of breath showed "no evidence of pulmonary embolism in the main pulmonary artery, right and left pulmonary arteries or their major distributions", however, the CT did "not exclude distal pulmonary emboli." (Tr. 760). Additionally, "[t]he lung parenchyma demonstrate[d] mild dependent atelectasis." *Id.*

Also in April 2015, Plaintiff reported his chest pain was worse with cough and movement, was "present daily and better as [the] day passes, worse in am and cough." (Tr. 775). He reported "mild exertional dyspnea" and that he "does not use inhalers." *Id.* He reported he "[l]ive[d] with a friend and takes care of [h]is house and gets paid for his services." *Id.* On examination, the physician noted Plaintiff's respiratory system was "[n]egative for cough, wheezing or shortness of breath." *Id.*

At an examination after an emergency room admission for alcohol detoxification in April 2015 (Tr. 474), Plaintiff was "[n]egative for cough, hemoptysis, wheezing or shortness of breath" and his lungs were "clear to auscultation, [with] no wheezing or rhonchi" (Tr. 476).

In May 2015, Plaintiff followed up with Khaleel Deeb, M.D., after being discharged from rehabilitation for alcohol abuse. (Tr. 819). In his review of systems, Dr. Deeb noted Plaintiff was "[n]egative for cough, hemoptysis, sputum production, shortness of breath, wheezing and stridor."

*Id.* On examination, Dr. Deeb noted Plaintiff's "[e]ffort [was] normal and breath sounds [were] normal" with no stridor, respiratory distress, wheezes, rales, or tenderness. (Tr. 820). Dr. Deeb recommended "regular aerobic exercise" and referred Plaintiff to pain management. *Id.*

Later in May 2015, Plaintiff underwent a neurological examination with Deepak Raheja, M.D. (Tr. 804-10). Plaintiff reported numbness and tingling in his legs at night (Tr. 804) and weakness when walking, with a "low back ache with radiation of pain to the lower extremities accompanied with paresthesias described as a sensation of numbness and tingling." (Tr. 806). On examination, Dr. Raheja noted Plaintiff had normal tone, power, and coordination in all four limbs. (Tr. 807). Plaintiff's gait and station were normal, as were his deep tendon reflexes. *Id.* However, Plaintiff had tenderness to palpation in the lower lumbar region, and a bilateral positive straight leg raising test. *Id.* An EMG/NCV study of Plaintiff's lower extremities was normal. (Tr. 810).

Later that same month, Plaintiff underwent a lumbar spine MRI. (Tr. 766-67). It showed "[m]ild degenerative changes of the lumbar spine[.]" (Tr. 767).

In June 2015, Plaintiff again saw Dr. Deeb. (Tr. 823-26). He reported shortness of breath "for years". (Tr. 823). On examination, Dr. Deeb again noted Plaintiff's "[e]ffort [was] normal and breath sounds [were] normal" with no stridor, respiratory distress, wheezes, rales, or tenderness. (Tr. 824). A chest x-ray showed a normal cardiac silhouette, lungs well expanded, and "[c]hronic subpleural linear opacity in the lingula secondary to scarring". (Tr. 818). The impression was "[n]o acute process." *Id.*

Plaintiff returned to Dr. Deeb in July 2015, complaining of bilateral lower extremity pain from his knees to toes. (Tr. 828). On examination, Dr. Deeb found decreased range of motion in both knees, and an abnormal pulse in both ankles. (Tr. 829). X-rays performed of Plaintiff's knees

were negative. (Tr. 837-38). A bilateral lower extremity pulse volume recording test was "[e]ssentially normal." (Tr. 839).

An EMG/NCV test of Plaintiff's upper extremities in July 2015 (performed due to complaints of pain, paresthesias, and weakness in the hands) revealed a mild median neuropathy of the wrists. (Tr. 850-51).

### VE Testimony

The VE testified that a person of Plaintiff's age, education, and with no past relevant work experience who had the residual functional capacity for medium work, but who would have to avoid concentrated exposure to fumes, odors, gases, or ventilation could perform jobs such as prep cook, order puller, or housekeeping cleaner. (Tr. 83).

### ALJ Decision

In a written decision dated September 24, 2015, the ALJ found Plaintiff had not engaged in substantial gainful activity since his application date, and had a severe impairment of COPD. (Tr. 36). The ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 39). The ALJ then concluded Plaintiff retained the residual functional capacity "to perform medium work as defined in 20 CFR 416.967(c) with the following additional limitations: must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc." (Tr. 40). The ALJ found Plaintiff had no past relevant work, but considering his age, education, and RFC, there were jobs in significant numbers in the national economy that he could perform. (Tr. 43). As such, the ALJ found Plaintiff was not disabled. (Tr. 44).

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

    1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

4.    Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single challenge to the ALJ's decision. He argues the ALJ's RFC determination—concluding Plaintiff was capable of medium work—lacks the support of substantial evidence, and argues the evidence shows Plaintiff is only capable of light work. (Doc. 16, at 8-11).[4] Within this argument, Plaintiff contends the ALJ erred in her evaluation of examining

_____

4. The regulations define light and medium exertional work as follows:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing

and reviewing physician opinion. *Id.* The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence. (Doc. 18, at 6-16). For the reasons discussed below, the undersigned agrees with the Commissioner and affirms her decision.

An individual's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). In making this determination, the ALJ must consider all relevant evidence in the case record. *Id.*; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 416.945(a)(3). This includes consideration of the limiting effects of both severe and non-severe impairments. *Id.* § 416.945(e). The ALJ is required to evaluate every medical opinion received. *Id.* § 416.927(b). The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.").

---

a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 416.967(b)-(c); *see also* SSR 83-10p, 1983 WL 31251.

For the reasons discussed below, the undersigned finds no error in the ALJ's RFC analysis. The ALJ satisfied her duty to evaluate all the records, including the objective evidence, opinion evidence, and Plaintiff's own description of his limitations. (Tr. 40-43); 20 C.F.R. § 416.945(a)(3); SSR 96-8p, 1996 WL 374184, at *5. The ALJ's ultimate determination that Plaintiff could perform medium exertional work is supported by substantial evidence.

### *Consideration of Consultative Examiner Opinions*

Plaintiff first argues the ALJ erred in her evaluation of the two examining physicians' opinions. Specifically, he argues the ALJ should have re-contacted both Dr. Papirova and Dr. Assaf to clarify their opinions, and that the ALJ's opinion is not consistent with those opinions as she so found.

Dr. Papirova summarized her examination findings and for her "medical source statement" opined: "There are mild limitations to pushing, pulling, and lifting. There are moderate limitations to physical exertion due to shortness of breath." (Tr. 428). The ALJ considered Dr. Papirova's consultative opinion and explained she assigned that opinion "some weight" because Dr. Papirova's conclusions were

> generally supported by objective signs and findings upon examining the claimant. For example, Dr. Papirova noted that the claimant's gait was normal, he could walk on his heels and toes, squat was full, stance was normal, he was able to get off and on the examination table without assistance, and was able to rise from a chair without difficulty. There were decreased breath sounds; however, chest and lung examinations were otherwise normal. Straight leg raises were negative bilaterally, and range of motion and strength were essentially normal throughout. A pulmonary function study was essentially normal. While these findings are supportive, it is not clear what Dr. Papirova determines to be "moderate" limitations. However, the above residual functional capacity precludes heavy exertion work and limits the claimant's exposure to pulmonary irritants, which is consistent with limitations on physical exertion due to shortness of breath.

(Tr. 41-42).

14

Although Plaintiff is correct that the ALJ recognized that Dr. Papirova's medical source opinion did not define what functional restrictions were encompassed by "moderate limitations", the ALJ reasonably concluded, in light of Dr. Papirova's physical findings, and the record as a whole, that a residual functional capacity which precluded heavy work and limited Plaintiff's exposure to pulmonary irritants was "consistent with [Dr. Papirova's] limitations on physical exertion due to shortness of breath." (Tr. 42). Notably, the ALJ stated she was only assigning Dr. Papirova's opinion "some weight" and thoroughly summarized Dr. Papirova's physical findings, including Plaintiff's normal pulmonary function test, and normal physical findings except for decreased breath sounds. *Id.*

Plaintiff's contention that the ALJ was required to re-contact Dr. Papirova to clarify her conclusions is also unavailing.[5] It is the ALJ, not a physician, who determines a claimant's RFC. *See* 42 U.S.C. § 423(d)(5)(B); *Nejat*, 359 F. App'x at 578 ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 416.946(c) (ALJ "is responsible for assessing your residual functional capacity"). And the ALJ is not required to accept any particular physician's opinion in its entirety in formulating an RFC. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding" and "does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). Additionally, "[t]he ALJ has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir.

---

5. The Court notes Plaintiff cites no law for the proposition that the ALJ should have re-contacted either consultative examiner. *See* Doc. 16, at 9.

2010) (citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). And, the regulation on point, 20 C.F.R. § 416.919p(b), provides, if a consultative examination report "is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." Dr. Papirova's report was neither inadequate nor incomplete for the ALJ to determine, in conjunction with the remaining evidence of record, Plaintiff's RFC. The report contained a detailed history and thorough examining containing mostly normal physical findings. *See* Tr. 425-41.

Plaintiff's argument about the ALJ's treatment of Dr. Assaf's opinion is unavailing for the same reasons. In his "medical source statement" Dr. Assaf stated Plaintiff "should avoid exposure to dust and other industrial pollutants" and had "mild limitations in activities requiring prolonged standing, walking, or lifting with both arms." (Tr. 457). The ALJ assigned this opinion "great weight" because Dr. Assaf's conclusions were "supported by objective signs and findings upon examining the claimant":

> For example, Dr. Assaf noted that claimant's gait was normal, he could walk on his heels and toes, squat was full, stance was normal, he was able to get off and on the examination table without assistance, and was able to rise from a chair without difficulty. The claimant's chest and lung examinations were also essentially normal throughout. However, Dr. Assaf noted tremors at rest in both hands. A pulmonary function study was performed; however, the claimant gave such poor and inconsistent effort that the study was not valid. Due to mild limitations on prolonged standing, walking or lifting, the undersigned finds that the claimant is limited to medium exertion work. In addition, consistent with Dr. Assaf's conclusion that the claimant should avoid exposure to dust and other industrial pollutants, the undersigned finds that the claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.

(Tr. 42). Again, Plaintiff has not shown Dr. Assaf's opinion to be "inadequate or incomplete". *See* 20 C.F.R. § 416.919p(b). While Plaintiff argues the ALJ did not know what Dr. Assaf meant by

"mild", the ALJ here specifically addressed Plaintiff's contention that Dr. Assaf's conclusions limited Plaintiff to light exertional, rather than medium exertional, work:

> However, "mildly limited in activities requiring prolonged standing, walking, or lifting with both arms," does not necessarily equate to light work. Furthermore, the weight of the objective evidence, in combination with Dr. Assaf's findings do not support limiting the claimant to light exertion work. The claimant's own testimony suggests greater ability than his representative argues. As noted above, he testified that he enjoys riding his bicycle, although he clarified upon questioning by his representative that he only rides around the block and for 30 minutes. The claimant also does not require the use of an inhaler as he has not used on in a long time according to his testimony. Pulmonary function studies have been essentially normal and respiratory examinations have been relatively normal throughout treatment records. Therefore, there is no objective evidence to support limiting the claimant to light exertion work.

(Tr. 42). Plaintiff argues "riding a bicycle for 30 minutes around the block does not demonstrate a capability for the strenuous requirements of medium work activity." (Doc. 16, at 9). As the passage above shows, the ALJ did not rely solely on Plaintiff's bicycle riding to find him capable of medium work. Rather, she also noted Plaintiff testified he does not use an inhaler, and the objective evidence of Plaintiff's difficulty has shown only mild findings (as discussed in greater detail below). *See* Tr. 42. Plaintiff has not shown the ALJ erred in her consideration of the consultative examiner's opinions.

### *Consideration of State Agency Reviewing Physician Opinions*

Plaintiff also argues the ALJ "unreasonably gave great weight to the opinions of the non-examining state-agency consultants" when it was "clear from their assessments that these consultants did not consider all of [Plaintiff's] medically determinable impairments", specifically, his lumbar impairment. (Doc. 16, at 10). Non-treating physician opinions are not entitled to the presumptive weight assigned to a treating physician's opinion. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Notably, an ALJ is not required to adopt the opinion of a physician in formulating an RFC, even one to which she assigns "great weight." *See Sonnenlitter v. Comm'r of*

*Soc. Sec.*, 2012 WL 4794639, at *15 (N.D. Ohio); *Smith v. Colvin*, 2013 WL 6504681, at *11 (N.D. Ohio); *Smith v. Astrue*, 2012 WL 6607007, at *8 (N.D. Ohio). That is, an RFC need not precisely mirror a particular medical opinion. And, conversely, assigning great weight to an opinion that does not include a particular impairment does not, therefore, mean that impairment was not considered within the ALJ's decision.

Additionally, an ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that was developed post-dating those opinions); *Patterson v. Comm'r of Soc. Sec.*, 2017 WL 914272 at *10 (N.D. Ohio) ("ALJ may rely on a state agency reviewer who did not review the entire record, so . . . long as the ALJ also considers the evidence post-dating the opinion."); *Ruby v. Colvin*, 2015 WL 1000672, at *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). A review of the ALJ's decision here shows that she did so. In her step two severity analysis, the ALJ explained her consideration of Plaintiff's lumbar and other musculoskeletal impairments:

> In general[], the claimant's neurological, musculoskeletal, and extremity examinations were essentially normal [citing Tr. 331, 424-42, 453-72, 229, 804, 807). However, there was tenderness in the lumbar spine and positive straight leg raises bilaterally in May 2015. An MRI of the lumbar spine in May 2015 demonstrated mild degenerative changes with no significant spinal canal or neural foraminal narrowing [citing Tr. 767]. An EMG/NCV study at the time was normal without any evidence of axonal denervating or segmentally demyelinating lesions [citing Tr. 810]. The claimant failed to follow-up with a pain management specialist referred by his treating physician [citing Tr. 823]. Upon follow-up in June 2015, the claimant's musculoskeletal and neurological examinations were essentially normal except for mild edema of the legs bilaterally [citing Tr. 824]. There was some decreased range of motion of the right and left knees and abnormal ankle

pulse bilaterally on examination in June 2015 [citing Tr. 829]. However, x-rays of the knees in July 2015 were normal [citing Tr. 833-39]. A pulse volume recording of the lower extremities was also essentially normal. While there is occasional evidence of some musculoskeletal symptoms, there is no medically determinable impairment that results in more than minimal limitations in the claimant's ability to perform basic work-related functions related to these symptoms and complaints.

(Tr. 39). Thus, the record reflects that the ALJ considered Plaintiff's lumbar impairment, even if the state agency physicians did not.[6] And she reasonably determined that the evidence of record did not show Plaintiff's lumbar impairment "result[ed] in more than minimal limitations in [his] ability to perform basic work-related functions[.]" (Tr. 39). The Court also notes that Plaintiff, at all times, has the burden of showing disability. 20 C.F.R. § 416.912(a)(1) ("In general, you have to prove to us that you are . . . disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) ("The burden is on the plaintiff to prove that [he] is disabled within the meaning of the regulations[.]"). Although Plaintiff argues "[t]he record demonstrates" that his "COPD, along with his degenerative arthritis of his lumbar spine, preclude him from performing the physical requirements of medium work activity" (Doc. 16, at 10), Plaintiff does not point to any evidence of record to demonstrate his non-severe lumbar impairment restricted him beyond the limitations found by the ALJ. As such, the undersigned finds no error in the ALJ's treatment of the state agency reviewing physicians' opinions.

In addition to finding no error in the ALJ's consideration of the opinion evidence, the Court finds the ALJ's RFC enjoys the support of substantial evidence in the record as a whole. As discussed within the analysis of the opinion evidence, the ALJ here considered the objective

---

6. And, indeed, they could not have. The state agency physicians reviewed the record in November 2013 and January 2014, Tr. 95-97, 109-10, and the evidence regarding Plaintiff's lumbar spine comes from May 2015, Tr. 766-67, 804-10.

evidence of record in formulating Plaintiff's RFC. For example, despite Plaintiff's claim he was disabled due to COPD and shortness of breath, the ALJ noted repeated physical examinations showing mainly mild findings. *See* Tr. 41; Tr. 326-27 (August 2011 notation of "good air exchange" and "defer[ing] initiation of additional inhalers given h[istory of] poor compliance w[ith] inhalers and currently minimum symptoms"); Tr. 330 (November 2011 notation of "[m]ild inspiratory rhonchi, otherwise clear"); Tr. 335 (December 2011 finding of expiratory rhonchi and wheezing); Tr. 759 (April 2015 chest x-ray showing "[s]uboptimal inspiration with crowding of brochovascular lung markings" but "[n]o evidence of acute abnormality"); Tr. 476 (April 2015 examination where Plaintiff was "[n]egative for cough, hemoptysis, wheezing or shortness of breath" and lungs were "clear to auscultation, [with] no wheezing or rhonchi."); Tr. 820 & 824 (May & June 2015 pulmonary/chest examination notes: "[e]ffort normal and breath sounds normal. No stridor. No respiratory distress. He has no wheezes. He has no rales. He exhibits no tenderness."). Additionally, within the opinion evidence, the ALJ also discussed two pulmonary function studies performed in conjunction with the consultative examinations. *See* Tr. 42. One was within normal limits and the other invalid due to suboptimal effort. (Tr. 436-37, 465-67). The reliance on all of these objective findings provides support for the ALJ's finding that although Plaintiff did have limitations due to shortness of breath, he was not as limited as he so alleged.

The ALJ also considered Plaintiff's own statements as required, noting his statements were often inconsistent with the findings in the record, and he was non-compliant with counseling to stop smoking. (Tr. 41). The ALJ also specifically pointed out several inconsistencies in the record:

> For example, despite allegations of work-precluding impairments/symptoms, in November 2011, the claimant was working "odd jobs" [citing Tr. 330]. The claimant also reported to Dr. Koricke that he does odd jobs periodically [citing Tr. 415]. In addition, despite the claimant's testimony that he does not use an inhaler because he reacts negatively to the medication, he reported to a consultative examiner that his respiratory medications improve his symptoms [citing Tr. 454].

> While the claimant was using a cane at the hearing and alleges that he has used it off and on for years, he did not require the use of a cane during consultative examinations [citing Tr. 427, 456]. In addition, the claimant's treatment records mentions the use of a cane at one time; however, it does not document that use of a cane is medically required or prescribed.

*Id.* Again, this evidence provides support for the ALJ's conclusion that Plaintiff is not as limited in his residual functional capacity as he alleged. Notably, Plaintiff indicated to each consultative examiner that medication helped his respiratory symptoms. *See* Tr. 425 ("The claimant is saying that respiratory therapy, which he is using, is helping with his shortness of breath."); Tr. 454 ("He states that Advair and Symbicort improve his symptoms"). This is valid consideration and supports the ALJ's decision that Plaintiff was not as limited by his respiratory impairment as he alleged. *See Smith v. Comm'r of Soc. Sec.*, 564 F. App'x 758, 763 (6th Cir. 2014) (affirming ALJ's non-disability determination, including consideration of symptom improvement with medication).

This Court's power to review is limited to determining whether the ALJ's findings are supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

The ALJ here has provided substantial evidence for her conclusion that Plaintiff is capable of medium work.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence, and therefore affirms that decision.

s/James R. Knepp II
United States Magistrate Judge